**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| CHICKASAW MARINE SERVICES, LLC, *et al.*, ) | |
| ) | |
| Plaintiffs/Counterclaim Defendants, ) | |
| ) | |
| v.                             ) | **CIV. ACT. NO. 1:23-cv-232-TFM-C** |
| ) | |
| WILLIAM JOSEPH LADNIER, *et al.*, ) | |
| ) | |
| Defendants/Counterclaim Plaintiffs. ) | |

<u>**MEMORANDUM OPINION**</u>

On March 31, 2025, the Court entered an Order (Doc. 206) in which it **GRANTED in part and DENIED in part** Plaintiffs'/Counterclaim Defendants' *Motion for Summary Judgment* (Doc. 111, filed April1 15, 2024), **DENIED** *Defendants'/Counter-Plaintiffs' Motion for Partial Summary Judgment* (Doc. 114, filed April 15, 2024), and indicated it would issue a detailed analysis and reasons as to the motions within fourteen (14) days of the Order. This is the detailed analysis described in that Order.

## I.    JURISDICTION AND VENUE

The Court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1332 (diversity).

The parties do not contest personal jurisdiction or venue, and there are adequate allegations to support both. The district court has personal jurisdiction over the claims in this action because the events that gave rise to this action are alleged to have occurred within this district. *See Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291-92 (11th Cir. 2000) ("Specific jurisdiction arises out of a party's activities in the forum that are related to the cause of action alleged in the complaint. . . . General personal jurisdiction, on the other hand, arises from a defendant's contacts

with the forum that are unrelated to the cause of action being litigated. The due process requirements for general personal jurisdiction are more stringent than for specific personal jurisdiction, and require a showing of continuous and systematic general business contacts between the defendant and the forum state."). Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions that gave rise to this litigation occurred in this judicial district.

## II.    BACKGROUND

### A.    Factual Background[1]

In March 2022, Plaintiffs/Counterclaim Defendants Billy W. Haney ("Haney") and Charles

---

[1] At the summary judgment stage, the facts are "what a reasonable jury could find from the evidence viewed in the light most favorable to the non-moving party." *Cantu v. City of Dothan*, 974 F.3d 1217, 1222 (11th Cir. 2020) (quoting *Scott v. United States*, 825 F.3d 1275, 1278 (11th Cir. 2016)). "[W]here there are varying accounts of what happened, the proper standard requires us to adopt the account most favorable to the non-movant." *Id.* (quoting *Smith v. LePage*, 834 F.3d 1285, 1296 (11th Cir. 2016)). Therefore, the recitation of facts here are those construed in favor of the Plaintiffs. "The 'facts' at the summary judgment stage are not necessarily the true, historical facts; they may not be what a jury at trial would, or will, determine to be the facts." *Id.*

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or (4) issue any other appropriate order.

FED. R. CIV. P. 56(e)(1)-(4); *see also* S.D. ALA. CIVLR 56(b) ("The non-movant's brief must include: (1) all facts relied upon, each supported by a specific, pinpoint citation to the record: (2) all challenges to the movant's asserted facts; and (3) argument supported by legal authority as appropriate."); S.D. ALA. CIVLR 56(d) ("The Court will deem uncontroverted material facts to be admitted solely for the purpose of deciding the motion for summary judgment.").

When presented with cross-motions for summary judgment, the Court "view[s] the evidence and all factual inferences therefrom in the light most favorable to the non-movant, and resolv[es] all reasonable doubts about the facts in favor of the non-moving part." *Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005).

R. Kinzeler ("Kinzeler"),  and Salacia Holdings, LLC ("Salacia") negotiated with Warrior & Gulf Navigation, LLC, ("WGN") and United States Steel Corporation ("US Steel") to purchase three (3) parcels of property ("the Property"), one of which was owned by WGN and the other two by US Steel.  Doc. 111-14 at 1; Doc. 182, at 3.  Haney, Kinzeler, and Salacia agreed Salacia would purchase the Property, the three of them would form a holding company to operate a business on the Property, Salacia would be reimbursed for the purchase of the Property through the business operations, and when Salacia was reimbursed, ownership of the Property would be divided between the three of them, fifty percent (50%) owned by Salacia and fifty percent (50%) owned by Haney and Kinzeler.  Doc. 111-2 at 2-3.

On April 7, 2022, Salacia entered into a purchase agreement with US Steel and WGN for the Property with a purchase price of $2,100,000.00.  Doc. 111-14 at 2-44.  In May 2022, Haney and Kinzeler occupied the Property and began to operate barge fleeting services during the due diligence period before Salacia closed on the Property.  Doc. 114-7 at 67, 195; Doc. 114-8 at 23; Doc. 143-2 at 2-4.  In early August 2022, Salacia determined it could not proceed with the purchase of the Property.  Doc. 111-14 at 47.  Haney and Kinzeler were unable to secure conventional financing to close the purchase of the Property within the timeframe that US Steel demanded, so they approached Defendant Plaintiff William Joseph Ladnier ("Ladnier") in August 2022 to secure the necessary financing to purchase the Property.  Doc. 111-3 at 2-5.

Kinzeler states in early August 2022, Haney, Ladnier, and he met at a restaurant where they agreed they would be one-third partners.  *Id.* at 6.  Kinzeler states they agreed Ladnier would provide the financing to purchase the Property, Haney and he would bring customers to the business that would operate on the Property, and when Ladnier was reimbursed the financing for the Property, the three of them would become one-third co-equal owners of the Property.  *Id.*

Kinzeler states reimbursement payments to Ladnier would begin after the purchase of the Property closed but an interest rate was not discussed. *Id.* at 7. Kinzeler also states "There was no specified payment terms or an amount in that August meeting." Doc. 114-7 at 59. Haney states:

> A.    We had a deal to do a deal together.
>
> . . .
>
> A.    We had a deal for [Ladnier] to be brought in as an investor on the property to move forward to get it closed in a timeline that U.S. Steel would be happy with and then agreed we would finalize everything else, operating agreements. [Ladnier] didn't know what his money was going to cost him. . . .
>        [Ladnier] did not have any idea on that day if his money was going to cost him 12 percent or 6 percent. We couldn't nail it down. . . .
>        We could not make the deal in August because he didn't know what his deal would be. He did not have the 2.1 either, so how would he know what his money was going to cost him?

Doc. 114-8 at 50-51.

On August 4, 2022, Haney informed a representative of US Steel that Salacia would not complete the purchase of the Property, but Ladnier would be able to complete the purchase and a new purchase agreement would need to be drafted to indicate a new buyer, Gulfstream Marine. Doc. 111-14 at 45-46.

On August 8, 2022, Plaintiff/Counterclaim Defendant Chickasaw Marine Services, LLC ("CMS") (Haney, Kinzeler, and CMS will be collectively referred to as "Plaintiffs"), was registered with the State of Alabama with Kinzeler listed as the managing member, and Haney and Ladnier listed as organizers. Doc. 111-8 at 104-11. CMS was to be the business that would operate on the Property by which Ladnier would be paid for his financing, according to Kinzeler. Doc. 111-3 at 7.

Under the terms of the proposed purchase agreement for the Property between US Steel and WGN, as sellers, and Ladnier, as the buyer, Ladnier had to pay $100,000.00 as an earnest

money deposit ("the Deposit") to secure the Property purchase. Doc. 111-14 at 49-50. Kinzeler states Ladnier asked if Haney and he would contribute $50,000.00 for the Deposit, which was paid by Kinzeler on behalf of both Haney and him. Doc. 111-2 at 9; Doc. 111-3 at 10; Doc. 111-10 at 8. On August 22, 2022, Ladnier emailed Haney and Kinzeler to inform them he wished to pay the Deposit, and later that evening, Ladnier emailed Kinzeler wiring instructions for the Deposit. Doc. 111-8 at 98-100. On August 23, 2022, Kinzeler wired the $50,000.00 to the account that Ladnier provided, and on that same date, Ladnier wired the Deposit to the closing agent, Alabama Title Company, Inc. ("Alabama Title"), from the account to which Kinzeler wired his portion of the Deposit. Doc. 111-3 at 23-25; Doc. 111-8 at 6-9, 81-82,95-97. On that same date, US Steel and WGN entered into a purchase agreement with Ladnier for the sale of the Property. Doc. 111-14 at 86.

The sale of the Property closed on September 23, 2022 ("the Closing"). To close the sale of the Property, the purchase funds, plus additional related expenses, were wired to Alabama Title from several accounts that were controlled by Ladnier: (1) on August 23, 2022, $100,000.00 from the account to which Kinzeler wired his portion of the Deposit - a savings account for one of Ladnier's minor daughters; (2) on August 31, 2022, $202,077.58 from an irrevocable trust for one of Ladnier's minor daughters; (3) on August 31, 2022, $202,277.57 from an irrevocable trust for another of Ladnier's daughters, (4) on September 2, 2022, $586,000.00 from an account for one of Ladnier's minor daughters; (5) on September 21, 2022, $250,000.00 of loan funds from Hancock Whitney Bank; and (6) on September 22, 2022, $774,620.08 from a loan to Ladnier and Defendant/Counterclaim Plaintiff Gulfstream Properties, LLC ("GPLLC"), from Defendant Gulfstream Investments, LLC ("GILLC") (Ladnier, GILLC, and GPLLC will be collectively referred to as "Defendants") that was secured by a mortgage on the Property. Doc. 111-8 at 7-9,

11, 56-57, 81-97, 101-03.

After closing, on September 24, 2022, Ladnier texted Kinzeler: "Would like to schedule Tuesday morning 9:30 or 10:00 to show you guys the business and accounting software that I'd like to use to run the place.  We can also start outlining business plan."  Doc. 111-1 at 8.

On October 4, 2022, Haney, Kinzeler, Ladnier, and Cole Mavar ("Mavar"), a member of GPLLC and the manager of GILLC, met at the office of an attorney, Henry Dick ("Dick"), to discuss, among other things, an operating agreement for CMS.  Doc. 111-8 at 47-49.  In a text message between Haney, Kinzeler, Ladnier, and Mavar about potential topics to discuss at the meeting with Dick, Haney texted:

> I am good.  I suggest we put a list of discussion items together before the meeting.
>
> I have[:]
>
> 1– easement proposal from Zenith Terminals[;]
>
> 2- easement/access proposal from Honeywell[; and]
>
> 3- operating/cross purchase agreements with Haney, Kinzeler, [and] Ladnier[.]
>
> Any other topics?

*Id.* at 49, 132.  Ladnier responded "Yes[,] I agree.  Operating agreements and business plan."  *Id.*

A transcript of the October 4, 2022, reads:

> MR. DICK:    So I'm really just trying to figure out - - you know, I guess the biggest thing would be, you know, you guys through Chickasaw are going to be generating revenues to pay this debt.  [Inaudible.]  He sells that property.  We want a source that pays back the - - generate the - - the fees to build up the equity.
>
> I guess the biggest thing is how do we handle that payment to you guys.  And, you know, we could probably do it as part of that ground lease.  But we could also probably bring you in as maybe economic interest owners in Gulfstream Properties.
>
> And I'm not sure what that - - at what point in time we'd bring y'all in.  But maybe we'd bring y'all in - - I don't know if it's when we refinance this thing.  I know that's something that you're looking to accomplish.  So - -

MR. LADNIER:       Well, I know that part.  We talked about that.  And it's when we get the property paid off.

MR. DICK:     So does that mean even if you refinance it - -

MR. LADNIER:       It's - -

MR. DICK:     - - through Hancock and having - -

MR. LADNIER:       It's - -

MR. DICK:     - - it paid off even then?

MR. LADNIER:       Which would be all of us.

MR. DICK:     Mm-hmm.

MR. LADNIER:       And I want to talk about how to do that, too.  But when Chickasaw Marine pays off Gulfstream Properties for the property, then at that point, in my opinion, these guys will be deserving, entitled to 50 percent of what - - of - - of that property, what it produces.  The money that it generates is - - is - - it needs to be split that way.

MR. HANEY: And the property?

MR. LADNIER:       Mm-hmm.

MR. HANEY: And the property.  So it really can't be Chickasaw Marine owning just a third, a third, and a third.  So we need to be - - -

MR. KINZELER:       Do you want him to - -

---

[2] GPLLC objects to the transcript of the October 4, 2022, as inadmissible hearsay, pursuant to Fed. R. Evid. 801, to the extent it constitutes a statement by anyone other than Ladnier or GPLLC.  Doc. 136 at 7.

"The general rule is that inadmissible hearsay cannot be consider on a motion for summary judgment." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293 (11th Cir. 2012) (quoting *Macuba v. DeBoer*, 193 F.3d 1316, 1322 (11th Cir. 1999).  "Nevertheless, 'a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduce to admissible form." *Id.* at 1293-94 (quoting *Macuba*, 193 F.3d at 1323).

Since the statements at the October 4, 2022, could be elicited from the declarants at the trial of this matter, the Court **OVERRULES** GPLLC's objection to the transcript of the meeting being considered for purposes of this motion for summary judgment.

Doc. 111-10 at 3-4.  Kinzeler states, at the October 4, 2022 meeting, it was agreed that CMS would pay $25,000.00 monthly to GPLLC when CMS generates sufficient revenues of which approximately $23,000.00 was for debt payment and $2,000.00 was for principal payment.  Doc. 111-2 at 4; Doc. 111-3 at 11-13.

In a text message that was sent on January 19, 2023, from Ladnier to Haney and Kinzeler, Ladnier stated:

> Also need the 24 K moved from Chickasaw Marine to Gulfstream properties.  It will cover October.
> It will be labeled rent according to one tax finance/legal expert that works closely with [Dick].
> If everything goes through for Chickasaw Marine owning Gulfstream properties, then Chickasaw Marine would still rent or lease the property from Gulfstream properties and all the partners would own Gulfstream properties.  We will confirm that this is optimal legal and tax strategy for us all.

Doc. 111-1 at 4.

On March 15, 2023, Wanderson Felix ("Felix"), who managed CMS's bookkeeping, created an invoice from GPLLC to CMS that was dated October 1, 2022, for the amount of $31,666.67, of which $6,666.67 was prorated for September 23-30, 2022, and of which $25,000.00 was for the month of October 2022.  Doc. 111-3 at 26-27; Doc. 111-6 at 2-9.

Ladnier was involved in several aspects of CMS's operations.  Immediately following the October 4, 2022 meeting, Haney, Kinzeler, Ladnier, and Mavar met at Hancock Bank in Biloxi, Mississippi, and a checking account was opened for CMS that included Ladnier as an authorized signer.  Doc. 111-8 at 12-13; 17-19.  Haney and Kinzeler solicited Ladnier for his help and opinion about a logo for CMS, and Ladnier provided feedback to them.  *Id.* at 34-38, 125-26.  Felix created an email address for Ladnier that used CMS's domain name.  *Id.* 39-40, 127.  On October 19, 2022, Ladnier attempted to establish water service for the Property in the name of CMS.  *Id.* at 41-45, 128.  In a group text with Haney and Kinzeler, Ladnier wrote "Can I get okay from both of

you that placing it under Chickasaw Marine accepted. Would be billed automatically starting whenever there's money in the account to cover it." *Id.* at 128. On January 17, 2023, in a text with Kinzeler, Ladnier inquired whether he should set up automatic payment for CMS's electricity bill, which was to be paid from its Hancock Bank account: "Would like your yay or nay on setting up auto pay for guard shack/gate power bill [t]o automatically come out of Chickasaw Marine Hancock Bank account. Current balance is $348.56." *Id.* at 63-66, 147. Kinzeler approved Ladnier's proposal. *Id.* at 147.

Ladnier endorsed a check from Vertex Energy, Inc. ("Vertex"), to CMS for $13,000.00 that was dated October 4, 2022, and on November 4, 2022, Ladnier deposited the check in CMS's account then immediately withdrew those funds. *Id.* at 19-21, 115-17. Using the withdrawn funds, Ladnier had three cashier's checks issued to members of GILLC: to Mavar in the amount of $3,333.00, to Charles Winter ("Winter") in the amount of $1,666.50, and to Alfred Moran ("Moran") in the amount of $1,666.50. Doc. 111-7 at 2-3; Doc. 111-8 at 25-27, 117-19. Of the original $13,000.00 that was deposited into CMS' account then withdrawn by Ladnier, the remaining $6,334.00 was deposited into GPLLC's account that was opened at Hancock Bank on the same day. Doc. 111-12 at 3-4, 20-21.

On December 14, 2022, Ladnier endorsed another check from Vertex to CMS in the amount of $11,750.00 that was deposited into the account of "William J. Ladnier d/b/a Gulf Stream Marine," then withdrawn by Ladnier two days later. Doc. 111-8 at 28-33, 120-24.

On January 20, 2023, in a group text with Haney, Kinzeler, and Mavar, Ladnier wrote "6500 vertex check is deposited/13k is transferred from CMS to Gulfstream properties./Will transfer remaining 12k next week if all goes well." Doc. 111-1 at 12. On January 26, 2023, in a response to an inquiry of how to pay for a crane that was to be delivered to CMS, Ladnier

responded "Ideally out of Chickasaw account even if it means me having to wait a bit more for the remaining 12k transfer from Chickasaw Marine to Gulfstream properties." *Id.* at 13.

At a meeting that was held on January 6, 2023, at Dick's office, Haney, Kinzeler, and Ladnier discussed the possibility that CMS would purchase the Property then the membership interests in CMS would be reapportioned among those who would be invested in the Property. Doc. 111-5 at 3-4. Dick states those at the meeting discussed the possibility that Haney and Kinzeler would each have a twenty-five percent (25%) interest, Ladnier would have a forty percent (40%) interest, and Mavar would have a ten percent (10%) interest. *Id.* Dantone was also present at the meeting and recalls those at the meeting also discussed splitting the interests in CMS into voting and nonvoting interests and Ladnier would hold fifty-one percent (51%) of the voting units. Doc. 111-4 at 2-3. Frank Dantone ("Dantone"), an attorney for Haney and Kinzeler, states those at the meeting also decided Dick would prepare the relevant documents to effectuate the arrangements that they discussed at the meeting. *Id.* As to repayment to Ladnier, Kinzeler states, "The agreement was 10 percent interest, $25,000 per month to be applied to the interest and the principal," and payments would begin when CMS "had income and revenue to pay it." Doc. 114-7 at 107.

After the January 6, 2023 meeting, Ladnier continued to participate in CMS' operations. On January 9, 2023, in a group text with Haney, Kinzeler, and Mavar, Ladnier wrote:

> Unless any of you have serious reason for objection.
> I would like to see the clickers for the gate only be issued to owners or potential owners of the property.
> We may also elect to issue a clicker to a high-end client of the property if they come and go often.
> If there's reason for objection we can discuss in Friday meeting.

Doc. 111-8 at 50-51, 133. On January 16, 2023, in the same group text, Mavar wrote "I have the gate people coming to program some of the remotes I have./Just to clarify with y'all we only want

the four of us to have a clicker/remote to the gate." *Id.* at 52-54, 134.

On January 29, 2023, in a group text with Kinzeler and Ladnier, Haney asked "Good afternoon Will.  Can you send me the information on Gulf Stream property/I am using that as a credit reference for McDonough on the tug/Please sir." *Id.* at 45-47, 131.  Ladnier responded "Yes./I'll be home in about 1 hour and can send it" then followed with "Chickasaw Marine could use 50 Viaduct road or it could use/6268 Kimbrough blvd Biloxi MS 39532/It's also fine with me to use those addresses in any other combination that looks good on the credit app." *Id.* at 131.

In a group text with Haney, Kinzeler, and Felix, Ladnier indicated he was attempting to set up CMS's email on his personal computer, approved Felix's efforts to setup CMS on Google Business, and provided input on how to transfer funds to pay CMS's expenses and vendors.  Doc. 111-1 at 1-6.  In an email that was sent on February 26, 2023, to Dick, Mavar, Alfred and Stacey Moran, George Sliman, and Chuck Winters, Ladnier wrote "We just received our official U.S. port designation.  Our security plan allows for the arrival and departure of international vessels and crew."  Doc. 143-3 at 3.

In a group text with Haney, Kinzeler, and Ladnier, on January 18, 2023, Mavar informed them he would go to an auction in Livingston, Louisiana where he purchased a crane to be used at the Property.  Doc. 111-1 at 9-10.  In response to Mavar's message, Ladnier wrote "That sounds awesome on the crane.  Nice work." *Id.* at 10.  On January 18, 2023, in a group text with Kinzeler, Ladnier, and Mavar, Haney sent a list of CMS's docket customers who were at the Property, to which Ladnier responded "That's good news.  Great to hear." *Id.* at 11.

On January 25, 2023, Ladnier met with a representative from Hancock Bank to get a business credit card for Chickasaw Marine.  Doc. 111-12 at 22.

On March 6, 2023, Kinzeler filed a Certificate of Amendment with the State of Alabama

to amend Ladnier as an organizer and replace him with Haney as well as amend the organizer

street address from 5720 Gulf Stream Road, Biloxi, Mississippi 39532 to 2524 South Dalies Road,

Mobile, Alabama 36605.  Doc. 111-11 at 5-6.

> On March 7, 2023, Dick met with Dantone about which Dantone states:
>
> Well, basically, [Dick] told me that he was having a hard time with [Ladnier]. [Ladnier] couldn't make up his mind.  He kept changing his opinion about thing, about how to do things.
>
> And his basic conclusion to me was, was that it wasn't going to work out, that [Ladnier] did not want to transfer the property to Billy and them.  He didn't want to become - - to enter into a business relationship with [Haney] and [Kinzeler], that he wanted to be a landlord only.  And he wanted – and he would own the property, [Kinzeler] and [Haney] would have no interest in the property.
>
> And the . . . he just wanted to own the property and that [Kinzeler] and [Haney] would have nothing to do with the property.  And he wanted to just lease the property to [Kinzeler] and [Haney].
>
> And that was his - - you know, it was kind of cut and dry, that he didn't think it'd work out between - - his relationships, he just didn't think it was a workable situation anymore.

Doc. 111-4 at 5-6.

> On April 3, 2023, Dick sent Haney and Kinzeler a document titled "Proposed Lease Terms

– Letter of Intent ('LOI')," in which it was proposed the Property would be leased to CMS by

GPLLC for an initial term of five (5) years with three (3) subsequent options to renew for five (5)

additional years.  Doc. 1-1 at 16-18.  In response to the proposed lease, Dantone sent a letter to

Dick that is dated April 25, 2023, in which he wrote:

> The following will serve to provide a counter to your letter of intent previously sent concerning the Chickasaw property.  Billy and Sam would like to counter this proposal with an outright offer to purchase the property for three and one-half million dollars.  They would be willing to pay the originally agreed lease payments of $25,000.00 per month until the date the sale is closed.
>
> . . .

Please present this counter proposal to [Ladnier] and I believe that is more than fair since the provable facts are clear in this entire deal excluding the dry dock, that one deal was brought to [Ladnier] and if Salacia had been able to follow through with their commitment, [Ladnier] would only have been involved in the dry-dock and not the property. [Ladnier] has $2,050,000.00 invested in the purchase of the property and [Kinzeler] and [Haney] have $50,000.00 invested in the purchase of the property. Making almost $1,500[,]000.00 on a piece of property in less tha[n] a year is a pretty good return on his investment. I included [Mavar]'s $400,000.00 as par[t] of [Ladnier]'s investment.

*Id.* at 19.

On May 3, 2023, Dick replied to Dantone's letter via email in which he stated:

As I indicated several times, [Ladnier] is not interest in selling the property to your clients, especially at a substantially discounted value. The $3.5M offer is substantially less than the $5.8M the property appraised for shortly after the closing.

At this time, [Ladnier] is only interested in leasing the property to your clients. I forwarded you the proposed lease terms several weeks ago. If those terms are not agreeable, I advise you to make a counteroffer and very soon. We've been more than patient by allowing your clients to conduct business on the property and dry dock for over 6 months without paying anywhere near fair rental value.

*Id.* at 20.

In a letter dated June 9, 2023, to CMS, Haney, and Kinzeler, counsel for GPLLC informed:

I represent [GPLLC] with regard to the property you currently occupy at 50 Viaduct Road, Chickasaw, AL. Despite attempts to negotiate an agreement which would ratify your prior occupancy of the property and provide a long-term lease going forward, those efforts have failed.

While our position is that you are occupying its property at sufferance, to the extent a tenancy at will exists, then on behalf of [GPLLC], I am notifying you that tenancy will be terminated effective ten (10) days from the above date. After that date, [GPLLC] calls upon you to surrender possession of the property.

Doc. 114-18 at 1.

In a follow-up letter dated June 21, 2023, to CMS, Haney, and Kinzeler, counsel for

GPLLC informed:

As noted from my prior letter dated June 9, 2023, to the extent a tenancy at will existed, it ended on or before June 19, 2023. Now in accordance with Alabama law, I call upon you to surrender possession of the property you currently occupy at 50 Viaduct Road, Chickasaw, Alabama and all other real property owned by [GPLLC].

Doc. 114-19.

In June 2022, Haney was offered the opportunity to purchase a drydock from Marathon Oil and told Kinzeler, who said Ladnier was interested in acquiring one. Doc. 111-2 at 6. Kinzeler surveyed the drydock, which was moored in Ashland, Kentucky. Doc. 111-3 at 14. Ladnier intended to use the drydock at one of his properties in Biloxi. *Id.* at 15. Ladnier purchased the drydock, with Gulf Stream Marine listed as the buyer, and it was towed to the Property. *Id.* at 16-18; Doc. 111-8 at 76.

At the October 4, 2022 meeting at Dick's office, the following was discussed in regard to the drydock:

> MR. LADNIER:      . . . Let the dry dock be its own LLC.
> MR. MAVAR:         For liability, too.
> MR. LADNIER:      For liability purposes. And - - and it - - and the dry dock works for Chickasaw Marine.
> MR. KINZELER:     That's not a bad idea.
> MR. MAVAR:         I like that idea the best.
> MR. HANEY:         Chickasaw is just gonna do a lease just like the property then?
> MR. LADNIER:      Uh-huh.
> MR. HANEY:         And that's fine.
> MR. LADNIER:      Does that make sense?
> MR. HANEY:         That's fine.
> MR. LADNIER:      Because that's where the danger is.
> MR. HANEY:         That's no problem.
> MR. LADNIER:      I don't really even want any - -
> MR. KINZELER:     I agree.
> MR. LADNIER:      - - part of the - -
> MR. HANEY:         But the - -
> MR. LADNIER:      - - dry dock.
> . . .
> MR. LADNIER:      Yeah. I'm also a fan of what y'all talked about of letting somebody else run the dry dock.

Doc. 111-10 at 13-16.

Kinzeler states the drydock has been used by CMS since it was towed to the Property, there
was not an agreement about its use, and CMS has not paid for the use of the drydock.  Doc. 114-7
at 120-21.

CMS tendered checks to Ladnier monthly in the amount of $25,000.00, beginning with the
first check that was dated May 17, 2023, but Ladnier refused to negotiate them.  Doc. 111-8 at 60-
62, 140-46.

**B.     Procedural Background**

The complaint in this matter was originally filed in the Circuit Court of Mobile County,
Alabama, on May 24, 2023.  Doc. 1-1.  Plaintiffs bring against Defendants state-law claims for
specific performance (Claim 1), fraudulent misrepresentation (Claim 2), and unjust enrichment
and promissory estoppel (Claim 3).  *Id.*

On June 22, 2023, Defendants removed this action to this Court and invoked this Court's
diversity jurisdiction pursuant to 28 U.S.C. § 1332.  Doc. 1.  Defendants filed their answer to the
complaint on July 12, 2023.  Doc. 6.  Defendants filed a motion to amend their answer on
September 29, 2023, to assert against Plaintiffs by GPLLC counterclaims for trespass, conversion
of both real and personal property, unjust enrichment, and slander of title.  Doc. 21.  The Court
entered a show cause order (Doc. 22) to which Plaintiffs filed a response (Doc. 23) that stated they
did not have cause to oppose the motion to amend Defendants' answer.  The Court then granted
Defendants' request (Doc. 24) and they filed their amended answer on October 23, 2023 (Doc.
25).  On November 9, 2023, GPLLC filed its unopposed motion to amend counterclaim (Doc. 28)
that the Court granted (Doc. 35), and Defendants filed their second amended answer on November
27, 2023 (Doc. 37).

Related to the motion to amend counterclaim, on November 13, 2023, Plaintiffs filed a Motion for More Definite Statement, or, in the Alternative, for Extension of Time to Respond to Counterclaim (Doc. 31) that the Court found to be moot (Doc. 35). Plaintiffs filed their answer to the second amended counterclaim on December 11, 2023. Doc. 64.

On March 19, 2024, Plaintiffs filed a motion for leave to file a supplemental complaint (Doc. 104) for which the Court entered a show cause order (Doc. 105) to assert against Ladnier and GPLLC additional claims for intentional interference with contractual relations (Claim 4) and fraudulent deceit (Claim 5). Defendants filed their response in opposition to the motion (Doc. 106), and Plaintiffs filed a reply in support (Doc. 107). The Court granted the motion (Doc. 116), Plaintiffs filed their first amended complaint (Doc. 118) on April 21, 2024, Defendants filed their answer to the first amended complaint (Doc. 121), and Plaintiffs filed their answer to Defendants' counterclaims (Doc. 125).

On October 4, 2024, Plaintiffs filed their motion for leave to file second supplemental complaint (Doc. 168) for which the Court entered a show cause order (Doc. 170) to assert against Ladnier an additional claim for defamation (Claim 6). Defendants filed their response in opposition to the motion (Doc. 175), and Plaintiffs filed a reply in support (Doc. 176). The Court granted the motion (Doc. 180), Plaintiffs filed their second amended complaint (Doc. 182) on November 14, 2024, Defendants filed their answer to the second amended complaint (Doc. 183), and Plaintiffs filed their answer to Defendants' counterclaims (Doc. 185).

On April 15, 2024, Plaintiffs filed their motion for summary (Doc. 111), and brief in support (Doc. 112), as to Defendants' counterclaims against them. The Court entered a briefing order for the motion (Doc. 127), the deadlines of which were extended (Docs. 131, 133) by motions (Docs. 130, 132). Defendants timely filed their response in opposition to the motion (Doc. 136),

and Plaintiffs timely filed their reply in support of the motion (Doc. 143).

Also on April 15, 2024, Defendants filed their motion for partial summary judgment (Doc. 114), and memorandum in support (Doc. 115), as to all of Plaintiffs' claims against them. Plaintiffs timely filed their response in opposition to the motion (Doc. 123) before the Court entered a briefing schedule, but the Court subsequently set a deadline for Defendants to file their reply (Doc. 127), which was extended (Docs. 133, 141, 146, 147) by motions (Docs. 132, 140, 145), and Defendants timely filed their reply in support of the motion (Doc. 148).

On March 31, 2025, the Court entered an Order (Doc. 206) in which it granted in part and denied in part Plaintiffs' motion for summary judgment (Doc. 111), denied Defendants' motion for partial summary judgment (Doc. 114), and indicated it would issue a detailed analysis and reasons as to the motions within fourteen (14) days of the Order.

The Court finds oral argument unnecessary to resolve the issues that are raised in the motions for summary judgment, and therefore, the motions are ripe for adjudication.

### III.    STANDARD OF REVIEW

A party in a lawsuit may move a court to enter summary judgment before trial. FED. R. CIV. P. 56(a), (b). Summary judgment is appropriate when the moving party establishes there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *see also Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) ("Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'"). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Ritchey v. S. Nuclear Operating Co.*, 423

F. App'x 955 (11th Cir. 2011) (quoting *Anderson*, 477 U.S. at 248).[3]  At the summary judgment juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  Only disputes about the material facts will preclude the granting of summary judgment. *Id*.

The movant bears the initial burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A party must support its assertion that there is no genuine issue of material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1).  The admissibility of evidence is subject to the same standards and rules that govern admissibility of evidence at trial. *Clemons v. Dougherty County*, 684 F.2d 1365, 1369 n.5 (11th Cir. 1982) (citing *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 556 (5th Cir. 1980)).

Once the movant meets its burden under Fed. R. Civ. P. 56, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  "A genuine issue of material fact exists when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1232 (11th Cir. 2011) (quoting *Anderson*, 477 U.S. at 248).  The court must view the facts and draw all reasonable

---

[3] In this Circuit, "[u]npublished opinions are not considered binding precedent, but they may be cited as persuasive authority."  11th Cir. R. 36-2 (effective Dec. 1, 2014); *see also Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 n.1 (11th Cir. 2015) (per curiam) ("Cases printed in the Federal Appendix are cited as persuasive authority.").

inferences in favor of the non-moving party. *Id.* (citing *Rosario v. Am. Corrective Counseling Servs., Inc.*, 506 F.3d 1039, 1043 (11th Cir. 2007)); *Greenberg*, 498 F.3d at 1265 ("We view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion."). However, to avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586 (citations omitted). Conclusory assertions, unsupported by specific facts, that are presented in affidavits opposing the motion for summary judgment are likewise insufficient to defeat a proper motion for summary judgment. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). "Speculation does not create a *genuine* issue of fact." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (citation omitted). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *See Anderson*, 477 U.S. at 249-50 (emphasis in original) (citations omitted). In short, summary judgment is proper after adequate time for discovery and upon motion against a party who fails to make a showing that is sufficient to establish the existence of an element that is essential to that party's case. *Celotex*, 477 U.S. at 322.

Finally, Fed. R. Civ. P. 56(e) also provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order." FED. R. CIV. P. 56(e).

## IV.    DISCUSSION AND ANALYSIS

The Court will, first, address Defendants' motion for partial summary judgment as to Plaintiff's claims against them, then the Court will address Plaintiffs' motion for summary as to

Defendants' counterclaims.

**A.    Defendants' Motion for Partial Summary Judgment (Doc. 114)**

Defendants argue Plaintiffs do not have a valid or enforceable agreement against them because the purported agreement lacks mutual assent as well as certainty as to essential terms and, in the alternative, any purported verbal agreement by the parties is void pursuant to the relevant the statute of frauds because, by the terms of the purported agreement, it cannot be performed within one (1) year from its making, the purported agreement involves the sale of land, and the purported agreement involves the sale or purchase of securities - in this case, the transfer of membership interests in CMS.  Doc. 115 at 11-16.  Defendants also argue, if a valid verbal agreement exists, Plaintiffs breached the terms of the agreement when they failed to pay Ladnier and GPLLC.  *Id.* at 16.  Finally, Defendants request, since Plaintiffs do not have a right to use or occupy the Property, Plaintiffs' claims for damages be dismissed, Plaintiffs be ordered to vacate the property, Plaintiffs be ordered to cancel the *lis pendens* for the Property that they filed, and award Defendants compensatory damages from Plaintiffs in the amount of $25,000.00 per month for the time between September 23, 2022, when GPLLC closed on the Property and Plaintiffs occupied it, until they no longer occupy the Property.  *Id.* at 17-19.

In response, Plaintiffs argue there was a valid enforceable agreement between the parties based on Ladnier's acts and omissions and the parties verbally agreed to the essential terms of the agreement.  Doc. 123 at 13-18.  Plaintiffs argue the parties' purported verbal agreement is not void pursuant to the statute of fraud because it was able to be performed within one year, the purported agreement is excepted from the statute of fraud because Plaintiffs paid a portion of the purchase money and were put in possession of the land by GPLLC, and an interest in a limited liability company, like CMS, is not a security that is traded on an exchange or in a security market that

would subject a transfer of interest in it to the statute of frauds. *Id.* at 18-22. Plaintiffs also argue they have not breached the purported verbal agreement with Defendants because they paid $25,000.00 per month for the Property, subject to the agreed-on terms, and have tendered monthly payments since Ladnier informed Plaintiffs he did not intend to conclude their purported agreement. *Id.* at 22-23. Finally, Plaintiffs argue their claims for damages are not barred by the statute of frauds and their occupation of the Property is based on a valid enforceable agreement with Ladnier and GPLLC. *Id.* 23-25.

The Court will address Defendants' arguments in turn.

### 1. Whether There is a Valid Enforceable Agreement

Defendants assert the purported agreement lacks assent as well as at least one essential term to make it valid and enforceable. Doc. 115 at 11-13.

Under Alabama law, "'[t]he requisite elements of [a contract] include: an offer and an acceptance, consideration, and mutual assent to terms essential to the formation of a contract.'" *Ex parte Grant*, 711 So. 2d 464, 465 (Ala. 1997) (quoting *Stength v. Ala. Dep't of Fin., Div. of Risk Mgmt.*, 622 So. 2d 1283, 1289 (Ala. 1993)).

As to what constitute essential terms for an enforceable contract:

> "To be enforceable, the [essential] terms of a contract must be sufficiently definite and certain, *Brooks v. Hackney,* 329 N.C. 166, 170, 404 S.E.2d 854, 857 (1991), and a contract that '"leav[es] material portions open for future agreement is nugatory and void for indefiniteness"' . . . ." *Miller v. Rose,* 138 N.C. App. 582, 587–88, 532 S.E.2d 228, 232 (2000) (quoting *MCB Ltd. v. McGowan,* 86 N.C. App. 607, 609, 359 S.E.2d 50, 51 (1987), quoting in turn *Boyce v. McMahan,* 285 N.C. 730, 734, 208 S.E.2d 692, 695 (1974)). "A lack of definiteness in an agreement may concern the time of performance, the price to be paid, work to be done, property to be transferred, or miscellaneous stipulations in the agreement." 1 RICHARD A. LORD, *Williston on Contracts* § 4:21, at 644 (4th ed. 2007). "In particular, a reservation in either party of a future unbridled *right to determine the nature of the performance* . . . has often caused a promise to be too indefinite for enforcement." *Id.* at 644–48 (emphasis added). *See also Smith v. Chickamauga Cedar Co.,* 263 Ala. 245, 248–49, 82 So. 2d 200, 202 (1955) ("'A reservation to

either party to a contract of an unlimited right to determine the nature and extent of his performance, renders his obligation too indefinite for legal enforcement.'") (quoting 12 Am. Jur. *Contracts* § 66). *Cf. Beraha v. Baxter Health Care Corp.,* 956 F.2d 1436, 1440 (7th Cir.1992) (an indefinite term may "render[ ] a contract void for lack of mutuality" of obligation).

"Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain." 17A Am. Jur. 2d *Contracts* § 183 (2004). "The terms of a contract are reasonably certain if they provide a basis for *determining the existence of a breach and for giving an appropriate remedy.*" *Id.* (emphasis added). *See also Smith,* 263 Ala. at 249, 82 So.2d at 203.

*White Sand Grp., L.L.C. v. PRS II, LLC*, 998 So. 2d 1042, 1051 (Ala. 2008) (alterations and emphasis in original).

Here, Kinzeler states, at the August 2022 meeting between him, Haney, and Ladnier, they agreed they would be one-third partners, Ladnier would provide the financing to purchase the Property, Haney and he would bring customers to the business that would operate on the Property, and when Ladnier was reimbursed the financing for the Property, the three of them would become one-third owners of the Property. Doc. 111-3. at 6. Kinzeler states reimbursement payments to Ladnier would begin after the purchase of the Property closed but an interest rate was not discussed. *Id.* at 7. Also in August 2022, CMS was registered with the State of Alabama and, according to Kinzeler, was to be the business that would operate on the Property to generate funds to repay Ladnier's financing. *Id.* Later, at the October 4, 2022 meeting at Dick's office, Kinzeler states it was agreed CMS would pay $25,000.00 monthly to GPLLC when CMS generated sufficient funds. *Id.* at 11-13. GPLLC subsequently invoiced CMS for use of the Property consistent with the monthly payment that was agreed to at the October 4, 2022 meeting. *Id.* at 27. Based on Kinzeler's testimony, the parties agreed they would be one-third partners, Plaintiffs would pay Ladnier the price he paid for the Property, plus his financing costs, at a rate of $25,000.00 per month, and once Ladnier was reimbursed, the parties would become one-third

owners of the Property.  Accordingly, Plaintiffs have shown there is a genuine issue of material fact as to whether the parties agreed to the essential terms of an enforceable contract.

As to whether there is sufficient assent for an enforceable contract, "[a]ssent must be manifested by *something*.  Ordinarily, it is manifested by a *signature*."  *S. Energy Homes, Inc. v. Hennis*, 776 So. 2d 105, 108 (Ala. 2000) (emphasis in original).  The Alabama Supreme Court clarified whether a signature is required to make a contract enforceable as follows:

> The purpose of a signature on a contract is to show mutual assent, *see Ex parte Holland Mfg. Co.*, 689 So. 2d 65 (Ala. 1996); *Lawler Mobile Homes, Inc. v. Tarver*, 492 So. 2d 297 (Ala. 1986); *Ex parte Pointer*, 714 So. 2d 971 (Ala. 1997); however, the existence of a contract may also be inferred from other external and objective manifestations of mutual assent.  Unless a contract is required by a statute to be signed . . . or by the Statute of Frauds to be in writing . . . or unless the parties agree that a contract is not binding until it is signed by both of them . . . it need not be signed by the party against whom enforcement is sought, provided it is accepted and acted upon.  *See Paterson & Edey Lumber Co. v. Carolina-Portland Cement Co.*, 215 Ala. 621, 112 So. 245 (1927) . . . .

*Ex parte Rush*, 730 So. 2d 1175, 1177-78 (Ala. 1999).  "Conduct of one party to a contract from which the other may reasonably draw an inference of assent to an agreement is effective as acceptance."  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Kilgor*, 751 So. 2d 8, 11 (Ala. 1999).  "[A]ssent to a contract may be manifested when a plaintiff accepts the benefits of a contract," *Lyles v. Pioneer Housing Sys., Inc.* 858 So. 2d 226, 229 (Ala. 2003).

Here, Ladnier seemingly acknowledged the purported agreement in a text message "If everything goes through for Chickasaw Marine owning Gulfstream properties, then Chickasaw Marine would still rent or lease the property from Gulfstream properties and all the partners would own Gulf Stream properties."  Doc. 111-1 at 4.  Among other acts that evidence assent to the purported agreement, Ladnier opened a business checking account for CMS and included himself as an authorized signer, withdrew funds from it to reimburse his financing costs, attempted to establish an account for CMS with the local water service that was to be paid by CMS, and

authorized remotes for the Property's security gate be issued to "owners or potential owners" of the Property that included Haney and Kinzeler.  Doc. 111-8 at 12-13, 17-21, 28-33, 115-17, 120-24.  Accordingly, Plaintiffs have shown there is a genuine issue of material fact as to whether Ladnier assented to the terms of an enforceable contract.

### 2.    Statute of Frauds

Defendants argue the purported verbal agreement by the parties is void pursuant to the relevant the statute of frauds because, by the terms of the purported agreement, it cannot be performed within one (1) year from its making, the purported agreement involves the sale of land, and the purported agreement involves the sale or purchase of securities.  Doc. 115 at 11-16.  In Defendants' reply in support of their motion, they state they withdraw their argument that the purported verbal agreement involves the sale or purchase of securities and is subject to the statute of frauds.  Doc. 148 at 7.

Alabama's Statute of Frauds provides, in relevant part:

[E]very agreement is void unless such agreement or some note or memorandum thereof expressing the consideration is in writing and subscribed by the party to be charged therewith or some other person by him thereunto lawfully authorized in writing:

(1) Every agreement which, by its terms, is not to be performed within one year from the making thereof;

. . .

(5) Every contract for the sale of lands, tenements or hereditaments, or of any interest therein, except leases for a term not longer than one year, unless the purchase money, or a portion thereof is paid and the purchaser is put in possession of the land by the seller[.]

ALA. CODE § 8-9-2(1), (5).

"The one-year provision of the Statute of Frauds applies to any agreement which by its terms cannot be performed within one year."  *Abbott v. Hurst*, 643 So. 2d 589, 592 (Ala. 1994)

(citations omitted).

[The Alabama Supreme Court] stated in *Land v. Cooper*, 250 Ala. 271, 276, 34 So. 2d 313, 318 (1948):

> In *Brown & Sons Lumber CO. v. Rattray* [238 Ala. 406, 192 So. 851 (1939)], this court approved the statement from 25 R.C.L. 454, § 29, that to bring a contract within the operation of this clause of the statute there must be an express and specific agreement that it is "not to be performed within the space of a year; if the thing may be performed within the year, it is not within the statute, a restricted construction being given to the statute on account of the negative form of the provision. A contract is not brought within the statute by the fact that the full performance within a year is highly improbable, nor by the fact that the parties may not have expected that the contract would be performed within the year. This is said to be true if there is a possibility of its being performed within a year, and there is no stipulation that it shall not be so performed." (238 Ala. [at] 410, 192 So. [at] 854).

*Stephens v. Stephens*, 680 So. 2d 329, 333 (Ala. Civ. App. 1996) (second and subsequent modifications in original).

Here, there is evidence to show the parties agreed to a $25,000.00 per month payment for the Property. At that rate, Plaintiffs would not be able to perform the agreement within one year. However, there is no evidence that shows Plaintiffs were solely limited to pay the debt in monthly installments. Plaintiffs could have paid the full amount of the debt within one year according to the purported terms of the parties' agreement.

The fifth section of the Alabama Statute of Frauds "requires that all contracts for the sale of real property be in writing and be signed by the party against whom the contract is asserted. The writing must contain a recital of the consideration supporting the contract." *Holman v. Childersburg Bancorporation, Inc.*, 852 So. 2d 691, 695 (Ala. 2002).

> Section 8–9–2(5) expressly excepts from its operation purchasers who pay "the purchase money, or a portion thereof," and who are consequently "*put in possession* of the land by the seller." (Emphasis added.) Construing the predecessor to § 8–9–2, this Court has stated:

Unless the facts bring the case within one of the statutory exceptions, if the parol agreement between the two parties for the purchase of real estate from a third person "involves a purchase by, or in the name of, one party and a subsequent transfer, conveyance, or vesting of an interest in the property to or in the other party, the statute of frauds applies." 37 C.J.S., Frauds, Statute of, § 119, subsec. b, p. 614.

If, however, the contract has been fully performed, by the seller putting the purchaser in possession under the contract and the purchaser paying the seller a part or all of the purchase price, the contract is valid and is saved by the exception.

*Talley v. Talley,* 248 Ala. 84, 87, 26 So.2d 586, 589 (1946). . . .

The possession requirement of the "part performance exception" to the requirement of a writing in land sales contracts was addressed in *Houston v. McClure,* 425 So.2d 1114 (Ala.1983). In that case, [the Alabama Supreme Court] reversed a summary judgment entered in a specific performance suit because there was a factual issue as to whether the acts of possession in the case were "referable exclusively to the contract." This requirement is mentioned in *Hagood v. Spinks,* 219 Ala. 503, 122 So. 815 (1929), in which the Court said:

> "To take a case out of the statute of frauds . . . upon the ground of part performance, the acts of possession must be clear and definite, and referable exclusively to the contract, and by authority of the vendor. The existence of the contract and its terms should be established by competent proof to be clear, definite, and unequivocal in all its terms. If its terms, or the necessary acts of part performance, are not sustained by satisfactory proof, specific performance will not be decreed." (Citations omitted [in *Smith* ].)

219 Ala. at 504, 122 So. at 816. The meaning of "referable *exclusively to the contract*" was discussed in *Jones v. Jones,* 219 Ala. 62, 121 So. 78 (1929). The Court stated as follows:

> The cases also hold that the possession of the purchaser must be exclusively referable to the contract . . . "that is to say, it must be such possession that an outsider, knowing all the circumstances attending it save only the one fact, the alleged oral

contract, would naturally and reasonably infer that some contract existed relating to the land, of the same general nature as the contract alleged" (36 Cyc. 660) . . . .

219 Ala. at 63–64, 121 So. at 78.  The *Jones* Court went on to say that[:]

"[T]he possession must be referable to the promise and not to some domestic relationship of the vendor and vendee.  36 Cyc. 660, note 77.  Where the person having the legal title to land is in possession, it is well established that such possession will be referred to the legal title.  Here, the title being in the father, and both father and son being in possession, the law refers the possession to the father."  (Citations omitted [in *Smith* ].)

219 Ala. at 64, 121 So. at 78.  The Court went further in adopting the following excerpt:

"In 36 Cyc. 660, is the following:  'If the possession * * * could be accounted for just as well by some other right or title actually existing in the vendee's favor, or by some relation between him and the vendor other than the alleged oral contract, it is not such a possession as the doctrine requires.'"

*Smith v. Smith,* 466 So.2d 922, 924–25 (Ala.1985) (emphasis added; footnote omitted).  Elsewhere, this Court explained that "'[t]he acts of part performance must . . . be such as would *not be done* but for the [alleged oral contract].'" *Quinlivan v. Quinlivan,* 269 Ala. 642, 645, 114 So.2d 838, 840 (1959) (emphasis added) (quoting *Gibson v. Bryant,* 267 Ala. 97, 99, 100 So.2d 32, 34 (1958)).  The exception applies only where "'the acts of part performance *cannot be explained* consistently with *any other contract* than the one alleged.'"  269 Ala. at 645, 114 So.2d at 840 (quoting *Gibson,* 267 Ala. at 99, 100 So.2d at 34) (emphasis added).

*Holman*, 852 So. 2d at 697-98 (formatting in original).

Here, Kinzeler states he paid $50,000.00 toward the earnest money for the purchase of the Property, so a partial payment of the purchase money has been shown.  As to whether Plaintiffs were put in possession of the Property by the seller, Haney and Kinzeler state they occupied the Property before GPLLC closed on it during the due diligence period before Salacia was to close

on the Property. Once Salacia determined it would not close on the Property, Haney and Kinzeler quickly sought another source of funds to close the deal for the Property. Haney and Kinzeler's rights to be on the Property would have terminated after Salacia did not complete the closing on the Property, but they continued to occupy the Property after they secured funding from Ladnier in accord with the terms of the purported agreement. Accordingly, having drawn all reasonable inferences in favor of Plaintiffs, the Court finds there is sufficient evidence to show the parties' purported verbal agreement for the sale of land is excepted from the Statute of Frauds.

### 3. Breach of Contract

Defendants argue, even if there is a valid verbal agreement between the parties, Plaintiffs breached they agreement because they failed to pay Defendants. Doc. 115 at 16.

"To establish a breach-of-contract claim, a plaintiff must show (1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages." *Hooper v. Columbus Reg'l Healthcare Sys.*, 956 So. 2d 1135, 1139 (Ala. 2006) (internal quotation marks and citations omitted).

According to the terms of the purported verbal agreement, CMS would repay the purchase price for the Property when it had sufficient funds to tender the $25,000.00 per month payments. Before Plaintiffs began issuing monthly checks to Defendants in May 2023, Ladnier endorsed and deposited checks to CMS then withdrew those funds to repay the purchase price for the Property. Ladnier also deferred payments from CMS so a crane could be purchased and used at the Property. Since CMS payments to Defendants were contingent on CMS generating sufficient funds to do so, according to the purported verbal agreement, and Plaintiffs have tendered payments to Defendants since May 2023, the Court finds, for purpose of summary judgment, Plaintiffs did not breach the agreement.

### 4.  Remaining Arguments

Defendants' remaining arguments are (1) Plaintiffs' claims for damages should be dismissed since they are based upon a right to use or occupy the Property, (2) if the Plaintiff do not have a valid and enforceable agreement, they should be ordered to vacate the Property and cancel the *lis pendens* that they filed, and (3) if Plaintiff never had a right to occupy the Property, GPLLC is entitled to compensatory damages of $25,000.00 per month from September 23, 2022 until Plaintiffs no longer occupy the Property.

Defendants' remaining arguments are based on the Court finding there is not a valid and enforceable agreement between the parties.  Since, for the purpose of summary judgment, the Court finds sufficient evidence to show the there is a valid and enforceable verbal agreement and the Statute of Frauds does not apply, Defendants' remaining arguments fail.

Accordingly, the Court finds Defendants' motion for partial summary judgment is due to be **DENIED**.  None of this precludes Defendants from raising these arguments at trial.

## B.    Plaintiffs' Motion for Summary Judgment (Doc. 111)

Plaintiffs argue GPLLC has not produced sufficient evidence to support its counterclaims against Haney and Kinzeler, individually, because they were present on the Property in their capacities as members of CMS and all of the business activities that have been conducted on the Property were either on behalf of CMS or its contractors and vendors.  Doc. 111 at 20-21.  Plaintiffs argue GPLLC has not produced sufficient evidence to support its claim of trespass because GPLLC permitted CMS to occupy the Property and even fostered their occupation of the Property.  *Id.* at 21-23.  Plaintiffs also argue GPLLC has not produced sufficient evidence to support its claim for conversion of the Property, drydock, and the security gate to the Property.  *Id.* at 23-24.  Specifically, Plaintiffs argue Alabama law does not recognize a claim for conversion as to real

property, which includes personal property that is incorporated into real property such as the security gate. *Id.* As for the drydock, Plaintiffs argue CMS was permitted by Ladnier and GPLLC to use it. *Id.* Plaintiffs argue GPLLC has not produced sufficient evidence to support its slander-of-title counterclaim because Plaintiffs have a colorable claim for specific performance of the purported verbal agreement and Alabama law mandates a notice of *lis pendens* be filed under the circumstances of this matter. *Id.* at 24-26. Plaintiffs also argue GPLLC's slander-of-title counterclaim fails because it has not produced sufficient evidence to show malice when Haney referred to Kinzeler and he as owners of the Property and Ladnier as an investor. *Id.* at 26-27.

In response, GPLLC argues it has produced sufficient evidence to show Haney and Kinzeler acted in their personal interests as to the Property and drydock because they took control of the property before CMS was formed, their discussions with Ladnier to acquire the Property from US Steel occurred before CMS was formed, and they seek as relief in this matter the Property be conveyed to them individually as well as to CMS. Doc. 136 at 11-13. GPLLC argues Defendants already occupied the Property before it purchased the Property, the parties did not agree on the terms for Plaintiffs' use of the Property, Plaintiffs do not have a right to occupy the Property, and Ladnier testified he cannot operate on the Property because he does not feel safe there. *Id.* at 13-14. GPLLC argues it has produced sufficient evidence to show the drydock has been converted by Plaintiffs because they have used the drydock since it arrived at the Property without an agreement for its use and have not paid to use it. *Id.* at 15. Finally, GPLLC argues it has produced sufficient evidence to show Plaintiffs slandered its title to the Property because they do not have an ownership interest in the Property and, therefore, do not have a colorable claim of an interest in it to file a *lis pendens* notice, Ladnier states he heard Haney tell a Vertex representative he was an owner of the Property, and CMS invoiced, among others, Vertex for use

of the Property.  *Id.* at 15-16.

The Court will address Plaintiffs' arguments, in turn.

### 1.    Counterclaims against Haney and Kinzeler Individually

In Alabama, "the law presumes that an agent of a disclosed principal does not incur personal responsibility absent affirmative evidence indicating otherwise."  *Smelser v. L H Truck Servs., LLC*, 166 So.3d 693 (Ala. Civ. App. 2014).  "A member of a limited liability company is not liable, solely by reason of being a member, for a debt, obligation, or liability of the limited liability company or a series thereof, whether arising in contract, tort, or otherwise . . . ."  ALA. CODE § 10A-5A-3.01.

Here, GPLLC closed on the Property in September 2022 and CMS was formed in August 2022.  Plaintiffs have submitted sufficient evidence that shows CMS operated on the Property since GPLLC acquired title to it, and Defendants have failed, at the summary judgment stage, to show either Haney or Kinzeler acted in their own personal interest as to the Property and drydock to hold them personally liable for GPLLC's counterclaims.

Accordingly, Plaintiffs' motion for summary judgment as to GPLLC's counterclaims against Haney and Kinzeler individually is **GRANTED**.

### 2.    Trespass

"'Trespass' has been defined as '[a]ny entry on the land of another without express or implied authority.'"  *Cent. Parking Sys. of Ala., Inc. v. Steen*, 707 So. 2d 226, 228 (Ala. 1997) (quoting *Foust v. Kinney*, 80 So. 474, 475 (1918)).

Plaintiffs have submitted evidence that tends to show CMS had at least implied authority to enter the Property: Haney and Kinzeler were provided remotes to the security gate and Ladnier established water service to the Property that was billed to CMS.  However, Plaintiffs were sent

notice from GPLLC's counsel any authority they had to occupy the Property was revoked. Further, the issue of whether the parties entered into a valid and enforceable verbal agreement will determine whether Plaintiffs had express authority to enter the Property.

Accordingly, Plaintiffs' motion for summary judgment as to GPLLC's counterclaim for trespass against CMS is **DENIED**.

### 3. Conversion

> To constitute conversion, there must be a wrongful taking or a wrongful detention or interference, or an illegal assumption of ownership, or an illegal use or misuse of another's property. *Ex parte SouthTrust Bank of Alabama, N.A.,* 523 So.2d 407, 408 (Ala.1988); *Ott v. Fox,* 362 So.2d 836 (Ala.1978). Conversion requires "a wrongful exercise of dominion over property in exclusion or defiance of a plaintiff's rights, where said plaintiff has . . . the immediate right to possession." *Empiregas of Gadsden, Inc. v. Geary,* 431 So.2d 1258, 1260 (Ala.1983).

*Covington v. Exxon Co., U.S.A.*, 551 So. 2d 935 (Ala. 1989).

Here, GPLLC brings against CMS claims for conversion of the Property and attachments thereto, and the drydock. GPLLC concedes Alabama law prohibits claims of conversion for real property and for fixtures or other attachments to real property. *See Baxter v. SouthTrust Bank of Dothan*, 584 So.2d 801, 805 (Ala.1991) ("An action for conversion will not lie for the taking of real property . . . nor will it lie for the taking of personal property that has been incorporated into real property."). Accordingly, Plaintiffs' motion for summary judgment as to GPLLC's counterclaim for conversion of the Property and for fixtures or other attachments to it is **GRANTED**.

As to the drydock, Kinzeler states it has been used by CMS since it was towed to the Property, there was not an agreement about its use, and CMS has not paid to use it. Doc. 114-7 at 120-21. Accordingly, Plaintiffs' motion for summary judgment as to GPLLC's counterclaim for conversion of the drydock is **DENIED**.

4.    **Slander of Title**

GPLLC's slander-of-title counterclaim is based on three alleged acts of Plaintiffs: (1) Plaintiffs' assert they have an ownership interest in the Property and filed a notice of *lis pendens* based on their assertion of ownership, (2) Ladnier heard Haney tell a Vertex representative he owned the Property, and (3) CMS issued invoices to Vertex to use the Property.  Doc. 136 at 16.

> Section 6-5-211, Ala. Code 1975, provides:  "The owner of any estate in lands may commence an action for libelous or slanderous words falsely and maliciously impugning his title."   The false and malicious statement "may consist of an assertion either that the plaintiff has no title to the property of which he is the ostensible owner, or that his title is defective, or that, as here, the defendant has himself an interest in or lien upon the property."  *Coffman v. Henderson*, 9 Ala. App. 553, 557, 63 So. 808, 809 (1913).

> The elements of a slander of title action are:

>> "(1) Ownership of the property by plaintiff; (2) falsity of the words published; (3) malice of defendant in publishing the false statements; (4) publication to some person other than the owner; (5) the publication must be in disparagement of plaintiff's property or the title thereof; and (6) that special damages were the proximate result of such publication (setting them out in detail)."

>> *Merchants Nat'l Bank of Mobile v. Steiner*, 404 So. 2d 14, 21 (Ala. 1981) (quoting *Womack v. McDonald*, 219 Ala. 75, 76-77, 121 So. 57, 59 (1929)).

*Folmar v. Empire Fire & Marine Ins. Co.*, 856 So. 2d 807, 809 (Ala. 2003).

> If a bona fide suit is filed on a colorable claim to property, no malice can be inferred from failure of the action.  "Even though false, if the defendant had probable cause for believing the statement, there can in law be no malice; and, though the fact that there was a want of probable cause for believing the statement is evidence of malice, it is not conclusive of its existence, nor its legal equivalent."  *Coffman v. Henderson*, 9 Ala. App. 553, 63 So. 808 (1913).  *See also Harrison v. Mitchell*, 391 So.2d 1038 (Ala.Civ.App.1980), and *Proctor v. Gissendaner*, 579 F.2d 876, supplemented 587 F.2d 182 (5th Cir. 1978).

*Steiner*, 404 So. 2d at 21.

Plaintiffs have sufficiently shown they have a colorable claim to an interest in the Property

and, therefore, malice could not be inferred in any claims that they have an interest in such.

As to the *lis pendens* notice, Alabama law requires:

> When any civil action or proceeding shall be brought in any court to enforce any lien upon, right to or interest in, or to recover any land . . ., the person . . . commencing such action or proceeding . . . shall file with the judge of probate of each county where the land or any part thereof is situated [a *lis pendens* notice].

ALA. CODE § 35-4-131. Since Plaintiffs have shown they have a colorable claim to the Property and filed the instant action to enforce their interest, they were required to file the *lis pendens* notice.

Accordingly, Plaintiffs' motion for summary judgment as to GPLLC's counterclaim for slander of title is **GRANTED**.

## V.    CONCLUSION

Accordingly, the Court **ORDERS** as follows:

(1)    Plaintiffs'/Counterclaim Defendants' *Motion for Summary Judgment* (Doc. 111) is **GRANTED in part and DENIED in part**.  The motion (Doc. 111) is **GRANTED** as to the following:

(a)    Defendants'/Counterclaim    Plaintiffs'    claims    against Plaintiffs/Counterclaim Defendants Charles R. Kinzeler and Billy W. Haney for conversion, unjust enrichment, and trespass;

(b)    Defendants'/Counterclaim Plaintiffs' claims for conversion of real property; and

(c)    Defendants'/Counterclaim Plaintiffs' claim for slander of title.

The motion (Doc. 111) is otherwise **DENIED**.

(2)    *Defendants'/Counter-Plaintiffs' Motion for Partial Summary Judgment* (Doc. 114). is **DENIED**.

**DONE** and **ORDERED** this 14th day of April 2025.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES DISTRICT JUDGE